**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2019-NMSC-020**

**Filing Date: October 31, 2019**

**No. S-1-SC-36537**

**STATE OF NEW MEXICO,**

      Plaintiff-Petitioner,

v.

**JESSE LAWRENCE LENTE,**

      Defendant-Respondent.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cindy Leos, District Judge**

Released for Publication December 17, 2019.

Hector H. Balderas, Attorney General
Eran Shemuel Sharon, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
C. David Henderson, Appellate Defender
Tania Shahani, Assistant Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**NAKAMURA, C. J.**

{1}      This is a "resident child molester" case.  *People v. Jones*, 792 P.2d 643, 645 (Cal. 1990), as modified (Aug. 15, 1990).  These cases generally involve defendants who have regular access to and control over children whom they sexually abuse in secrecy for long periods of time.  *See, e.g.*, *id.*  The child victims in these cases are usually the sole witnesses of the crimes perpetrated and, because of their age and the frequency of the sexual abuse to which they are subjected, cannot provide detailed

accounts of the abuse but only generalized accounts of frequent sexual contact with the defendant. *See, e.g.*, *id.* "[T]he prosecution of resident child molesters presents unique challenges rarely present in prosecution for other crimes." *R.L.G., Jr. v. State*, 712 So. 2d 348, 357 (Ala. Crim. App. 1997), *aff'd sub nom. ex parte R.L.G., Jr.*, 712 So. 2d 372 (Ala. 1998).

**{2}** Two issues are presented in this case which comes to us from the district court's decision to grant Defendant Jesse Lente's habeas petition. The first concerns Lente's indictment. It charged him with perpetrating various forms of sexual abuse on a regular basis against M.C., his stepdaughter. The district court, relying on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005), and *State v. Dominguez*, 2008-NMCA-029, 143 N.M. 549, 178 P.3d 834, concluded that Lente's indictment included "carbon copy" charges— charges that are truly identical, and not distinguishable by time or date or by specification that each charge was predicated on different acts—that impermissibly subjected him to double jeopardy. We disagree and conclude that the district court wrongly interpreted the principles articulated in *Valentine* and *Dominguez* and erred in determining that Lente's indictment included carbon copy charges that produced a double jeopardy violation.

**{3}** The second issue concerns the district court's determination that M.C.'s testimony was too generic and insufficient to support Lente's multiple convictions. Her testimony, the district court concluded, could support only one conviction for each type of sex-abuse crime Lente perpetrated and, therefore, Lente's multiple convictions violate double jeopardy. We disagree and take this opportunity to clarify the principles courts must utilize when evaluating the sufficiency of the evidence presented in resident child molester cases. We reverse and remand.

## I. BACKGROUND

**{4}** The indictment filed against Lente included thirty-eight counts. Thirty-two of those counts involved allegations that Lente sexually abused M.C. by perpetrating varying forms of criminal sexual penetration (CSP) or criminal sexual contact of a minor (CSCM). Those counts alleged that Lente forced M.C. to engage in fellatio on six different occasions, penetrated M.C.'s vagina with his fingers on four different occasions, touched M.C.'s vagina on seven different occasions, touched M.C.'s breasts on seven different occasions, and touched M.C.'s buttocks on eight different occasions. Table A sets out in chronological order the time periods and conduct in which Lente allegedly engaged.

| Date | Conduct |
|---|---|
| 8/1/97 - 1/31/98 (6 month span) | Touch Buttocks (TBu); Touch Breasts (TBr); Touch Vagina (TVa) |
| 2/1/98 - 7/31/98 (6 month span) | TBu; TBr; TVa |
| 8/1/98 - 1/31/99 (6 month span) | TBu; TBr; TVa |
| 2/1/99 - 7/31/99 (6 month span) | TBu; TBr; TVa; Penetrate Vagina Finger (PVF); Fellatio (F) |
| 8/1/99 - 1/31/00 (6 month span) | TBu; TBr; TVa; PVF; F |
| 2/1/00 - 7/31/00 (6 month span) | TBu; TBr; TVa; PVF; F |
| 8/1/00 - 11/30/00 (4 month span) | TBu; TBr; TVa; PVF; F |
| 12/1/00 - 12/12/00 (12 day span) | TBu; F |
| 12/13/00 (a single discrete date) | F |

Table A

**{5}**     At trial, Lente's counsel elicited unrefuted testimony showing that some of the sex abuse that Lente was alleged to have perpetrated could not have happened as Lente was not living with M.C. and her mother during the time frames some of the sex-abuse charges were alleged to have occurred.  The district court rightly granted Lente's motion for directed verdict in part and dismissed the sex-abuse charges that purportedly occurred at times when Lente did not live or have contact with M.C. and, thus, could not have committed certain crimes charged.

**{6}**     Lente's jury convicted him of all twenty-six sex-abuse counts that survived directed verdict:  six counts of CSP fellatio, four counts of CSP digital penetration, five counts of CSCM touching M.C.'s vagina, five counts of CSCM touching M.C.'s breasts, and six counts of CSCM touching M.C.'s buttocks.

**{7}**     Lente filed his appeal of right and raised three issues unrelated to the legality of the indictment or the sufficiency of the evidence presented at trial.  *State v. Lente*, 2005-NMCA-111, ¶ 1, 138 N.M. 312, 119 P.3d 737.  The Court of Appeals rejected all three arguments and affirmed Lente's convictions.  *Id.*  He filed a petition for a writ of certiorari which was denied.  *State v. Lente*, 2005-NMCERT-008, 138 N.M. 328, 119 P.3d 1265.

**{8}**     Lente then filed a series of pro se habeas petitions in district court asserting that he was entitled to a new trial or, alternatively, that his convictions should be vacated and he should be released.  Lente claimed that M.C. lied about the abuse as had M.C.'s mother, and he insisted that he did not commit the offenses for which he was convicted. Alternatively, he argued that his convictions violated his right to be free from double jeopardy.

**{9}**     The district court summarily denied Lente's initial pro se habeas petition without explanation.  After Lente filed a subsequent habeas petition, the court appointed Lente counsel.

**{10}** Lente's counsel made the same double jeopardy argument Lente advanced in his pro se habeas petitions: each of the counts in the indictment were "carbon copy" counts and, as a result, he was not "given adequate notice [of the charges against him], and consequently [Lente's] right to be free from [double] jeopardy was compromised." Lente's arguments relied on *Valentine* and *Dominguez*.

**{11}** The district court agreed that *Valentine* and *Dominguez* controlled as, in the district court's view, Lente's case was effectively identical to them. The court held that, "[g]iven the holdings in *Valentine* and *Dominguez*, the lack of specificity in the indictment and the testimony of M.C., . . . the multiple convictions for the same sexual acts violates double jeopardy."

**{12}** The court vacated most of Lente's sex-abuse convictions and sustained only one conviction for each type of the varying forms of sexual abuse Lente perpetrated upon M.C. The State appeals the district court's decision to grant Lente's habeas petition and vacate the convictions. We have jurisdiction over this appeal. Rule 12-102(A)(3) NMRA.

## II.     DISCUSSION

**{13}** The district court's conclusions require us to answer two questions. First, did Lente's indictment charge him with "carbon copy" counts and, in doing so, violate his double jeopardy rights? Second, was M.C.'s testimony sufficient to support Lente's multiple sex-abuse convictions and ensure his multiple convictions did not violate double jeopardy? We address these questions in turn.

### A.     The Indictment

**{14}** The district court concluded that Lente's indictment violated his double jeopardy rights. Specifically, the court held that the charges in Lente's indictment were insufficiently specific in the same way that the charges in the indictments in *Valentine* and *Dominguez* were and produced the same double jeopardy problems that led to the vacating of counts and/or convictions in those cases. Our review of whether a double jeopardy violation occurred is a legal question subject to de novo review. *State v. Bernal*, 2006-NMSC-050, ¶ 6, 140 N.M. 644, 146 P.3d 289. Before we address *Valentine* and *Dominguez* it is necessary to more broadly discuss the types of objections most commonly directed towards indictments in resident child molester cases. Doing so will give us clarity about the objections the district court and Lente have regarding his indictment.

#### 1.     Notice and multiplicity

**{15}** Objections to indictments comprised of unspecific charges are often presented as notice problems. *See State v. Huerta-Castro*, 2017-NMCA-026, ¶ 13, 390 P.3d 185; *State v. Gardner*, 2003-NMCA-107, ¶ 26, 134 N.M. 294, 76 P.3d 47; *State v. Baldonado*, 1998-NMCA-040, ¶ 18, 124 N.M. 745, 955 P.2d 214. Where defendants do

not have adequate notice of the charges filed against them, they cannot be expected to prepare a defense to those charges. *Baldonado*, 1998-NMCA-040, ¶¶ 18-21. Notice/due process objections are common in resident child molester cases given that the child victim's generic testimony will likely be the only evidence available. *See State v. Brown*, 780 P.2d 880, 885 (Wash. Ct. App. 1989).

**{16}** Lente never filed pretrial objections to the indictment or demanded any additional pretrial specification of the charges. Having failed to do so, he waived the opportunity to object to the indictment on notice or due process grounds. *State v. Selgado*, 1967-NMSC-147, ¶ 3, 78 N.M. 165, 429 P.2d 363; *State v. Lott*, 1963-NMSC-219, ¶ 5, 73 N.M. 280, 387 P.2d 855; *State v. Altgilbers*, 1989-NMCA-106, ¶ 46, 109 N.M. 453, 786 P.2d 680; *State v. Gammill*, 1985-NMCA-014, ¶ 5, 102 N.M. 652, 699 P.2d 125. Even if Lente was not precluded from first objecting to the indictment after trial, we are confident that Lente confronted no notice problem.

**{17}** At the hearing on Lente's habeas petition, trial counsel testified that she reviewed the indictment with Lente, informed him that the evidence against him was significant and credible, and suggested that he consider a plea deal. Lente, however, was "adamant about going to trial." She also testified that the varying sex-abuse charges in Lente's indictment did not, in her view, present any legal issues that needed to be addressed by pretrial motions. She said that she believed each count "to be a separate event."

**{18}** To the extent Lente was charged with crimes he could not defeat by showing lack of access to M.C., Lente's trial counsel attempted to convince the jury that M.C.'s mother fabricated the abuse because she was jealous Lente was involved with another woman. Counsel attempted to discredit M.C.'s testimony by emphasizing how details of the abuse emerged and evolved over time and by showing that M.C. did not exhibit behavior consistent with frequent and repeated sexual abuse. Lente's attempt to discredit his accusers is one commonly employed in resident child molester cases. *Jones*, 792 P.2d at 657-59. "Usually, the trial centers on a basic credibility issue—the victim testifies to a long series of molestations and the defendant denies that any wrongful touching occurred." *Id.* at 658. The evidence presented at trial indicated Lente did indeed sexually abuse M.C.

**{19}** M.C. testified that she was subjected to nearly continuous sex abuse for years. M.C.'s mother testified that the abuse came to light when she inadvertently walked in on Lente receiving fellatio from M.C. and, upon seeing this, demanded that Lente leave their shared residence. Lente refused, and M.C.'s mother attempted to call the police. Lente hovered around her, insisted "he didn't do anything," and ripped phone cords from walls to prevent her from completing the call. When the police finally arrived at the residence, Lente fled out of a rear window and remained at large for a week.

**{20}** All of the foregoing gives us confidence that Lente knew what he was charged with and knew what evidence he needed to marshal to defend against the charges. There is nothing to suggest that Lente was unsure of the charges he faced or was

somehow precluded from defending himself, and his alibi defense did in fact succeed in eliminating several of the sex-abuse charges.

**{21}** Because Lente did have notice of the charges, was capable of preparing a defense, and did not raise due process objections, Lente also cannot avail himself of the arguments raised in *Baldonado*, 1998-NMCA-040. There, the defendant argued that the two-year charging period during which he was alleged to have engaged in two counts of criminal sexual contact was too long to provide him "reasonable notice" of the charges. *Id.* ¶¶ 1, 18. For the reasons already stated, Lente cannot raise an equivalent argument to the overall charging period in his case which involved a series of consecutive, six-month charging intervals. A comment about these charging intervals is necessary.

**{22}** The district court and Lente both appear to question the State's authority to charge Lente with engaging in certain sex-abuse crimes in a repeating pattern of six-month intervals. Lente contends that the decision to charge in six-month intervals is "meaningless" and the district court characterized the choice as "inexplicable" and "random." We do not agree that the State's decision to charge by six-month intervals is somehow flawed or in any way unlawful.

**{23}** Thirty years ago, our Court of Appeals persuasively reasoned that the State is not, in resident child molester cases, stuck with only two choices: (1) charge a single count for the entire period of time the abuse allegedly occurred or (2) charge one count for every possible infraction. *Altgilbers*, 1989-NMCA-106, ¶ 43. The Court explained that "dividing the multi-year period of the alleged infractions into two- or three-month intervals advances the public interest in having the number of charges reflect the magnitude of the conduct while reducing [the] potential problems . . . that would arise from a single count encompassing several years." *Id.*

**{24}** *Altgilbers* correctly acknowledged that, while there is no hard and fast principle controlling how the State may elect to divide the time during which sexual abuse occurs in resident child molester cases, the absence of such a principle in no way precludes line drawing. *Id.* That line drawing is often necessary and an appropriate exercise of the State's authority to prosecute resident child molesters in a manner that correctly reflects condemnation of lengthy and repeated sexual abuse of children. There is nothing objectionable about the six-month intervals selected here.

**{25}** Multiplicity is also a common objection in multiple-charge instances like resident child molester cases. It is "the charging of a single offense in several counts." *United States v. Reedy*, 304 F.3d 358, 363 (5th Cir. 2002) (internal quotation marks and citation omitted); *accord Herron v. State*, 1991-NMSC-012, ¶ 6 n.4, 111 N.M. 357, 805 P.2d 624. Multiplicitous indictments are problematic because "[t]he repeated assertion of the details of a singular course of conduct in multiple counts will prejudice the defendant and confuse the jury by suggesting that not one but several crimes have been committed." *United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974) (per curiam).

**{26}** Multiplicity is a concern that arises from the Double Jeopardy Clause. *United States v. Pires*, 642 F.3d 1, 15 (1st Cir. 2011). "When an indictment includes multiple counts charging a violation of the same statutory provision and a claim of multiplicity is raised, an inquiring court must determine whether the facts undergirding each count can be treated as a distinct unit of prosecution." *Id.* "The critical inquiry is whether [the Legislature] intended to punish each statutory violation separately." *Id.* (internal quotation marks and citation omitted). The objection that an indictment is multiplicitous must be asserted before trial or the defense is waived. *United States v. Mastrangelo*, 733 F.2d 793, 800 (11th Cir. 1984).

**{27}** Lente did not object to the indictment as multiplicitous before trial, and we are confident that this was not a consequence of oversight or attorney error. The indictment alleged that Lente had different and discrete instances of sexual contact with M.C. on different and distinct dates over a period of years. As we already noted, Lente's counsel viewed each count as a separate event. This view is correct; each of these instances of sexual contact plainly constituted a different offense. The indictment did not produce a unitary conduct question. That is, Lente's activity is not "better characterized as one unitary act[.]" *State v. Bernal*, 2006-NMSC-050, ¶ 16.

**{28}** Lente suggests otherwise and argues that it is still unclear whether "the sexual acts to which [M.C.] was exposed occurred together as part of *one assaultive episode* or whether each instance of misconduct stood alone" (emphasis added). This claim is unpersuasive as this is not a case involving "one assaultive episode." *Herron* is the quintessential case of this species. 1991-NMSC-012. Lente's crimes do not prompt the questions that had to be asked in *Herron*.

**{29}** In *Herron*, the defendant penetrated a female victim multiple times over the course of a continuous, one-hour rape. *Id.* ¶ 17. In such instances, the question of unitary conduct becomes all important: If vaginal penetration occurs five times in a one-hour rape, is this five acts of criminal penetration or one? *Herron* concluded, by reliance on a series of analytical factors, that the multiple penetrations the defendant committed during the one-hour rape were not all distinct penetrations. *Id.* ¶¶ 20-22. Some were committed in such a fashion that they constituted only one criminal penetration. *Id.* As noted, this case bears no resemblance to *Herron*.

**{30}** The district court never wrestled with whether Lente's acts could, if supported by sufficient evidence, constitute multiple distinct crimes. And this is for good reason: There can be no question that our Legislature did indeed intend for different acts of criminal sexual penetration and contact perpetrated against a child on different and discrete dates over a course of years to constitute discrete violations of the statutes here implicated. *See id.* ¶ 15 ("[T]he greater the interval between acts the greater the likelihood of separate offenses[.]"); *see also State v. Martinez*, 2007-NMCA-160, ¶¶ 4-17, 143 N.M. 96, 173 P.3d 18 (rejecting a double jeopardy challenge to multiple CSPM convictions on grounds that the varying CSPMs occurred at different times); *State v. Salazar*, 2006-NMCA-066, ¶¶ 29-31, 139 N.M. 603, 136 P.3d 1013 (same). Multiplicity is not a concern in this case.

**{31}** The double jeopardy violation to which Lente was subjected, according to the district court, is the one the Sixth Circuit discussed in *Valentine* and which our Court of Appeals discussed in *Dominguez.* We must begin our discussion of these cases with *Russell v. United States*, 369 U.S. 749 (1962). *Valentine* relied heavily upon it. 395 F.3d at 635. *Dominguez* relied heavily on *Valentine. Dominguez*, 2008-NMCA-029, ¶¶ 5-11. *Russell* is the source of the law in both cases.

## 2. *Russell*

**{32}** *Russell* is a McCarthy-era case involving the House Un-American Activities Committee. 369 U.S. at 752 n.3. The defendants were charged by indictments with refusing to answer questions posed to them by a congressional subcommittee. *Id.* at 752. Under the statute allegedly violated, it was a misdemeanor to refuse to answer a question "pertinent" to the matter under congressional inquiry. *Id.* at 755-56. The defendants moved, pretrial, to quash the indictments asserting that they failed to identify how the questions the defendants refused to answer were pertinent. *Id.* at 752-53. The Supreme Court accepted this argument and, in explaining its rationale for doing so, discussed the nature of indictments and their sufficiency in any given case.

**{33}** The Court explained that an indictment must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet[]." *Id.* at 763 (internal quotation marks and citation omitted). This is the notice requirement implicating due process concerns we have already discussed. *See, e.g.*, *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). Indictments must also identify the offenses allegedly committed with sufficient specificity so that "in case any other proceedings are taken against [the defendant] for a similar offense" the record will show "with accuracy to what extent he may plead a former acquittal or conviction." *Russell*, 369 U.S. at 764 (internal quotation marks and citation omitted). This is a double jeopardy concern and the one the district court focused on and, thus, the one we focus on.

**{34}** The Supreme Court determined that the indictments at issue in *Russell* presented no double jeopardy concern. *Id.* The indictments were sufficiently specific and documents other than the indictment could be relied upon by the defendants in any future prosecution, if one ever came into existence. *Id.* The Court's own words deserve consideration.

> Since the indictments set out not only the times and places of the hearings at which the petitioners refused to testify, but also specified the precise questions which they then and there refused to answer, it can hardly be doubted that the petitioners would be fully protected from again being put in jeopardy for the same offense, particularly when it is remembered that they could rely upon other parts of the present record in the event that future proceedings should be taken against them.

*Id.*

**{35}** Secondary sources summarizing *Russell* state that "an indictment or information is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." 1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice & Procedure: Criminal*, § 125, at 542 (2008) (internal quotation marks and citation omitted); Article II: Preliminary Proceedings, 47 Geo. L.J. Ann. Rev. Crim. Proc. 273, at 341-42 (2018) (same). Wright goes on to point out, however, that the double jeopardy concerns *Russell* identified have marginal significance in practice. He notes that

> [i]t is doubtful that the second . . . function[, the double jeopardy protection,] add[s] anything not implicit in the notice requirement of the first function. If a defendant claims prior jeopardy in defense to a pending charge, the court is free to review the entire record of the first proceeding, not just the pleading, and so the need for the indictment to serve this role is limited.

1 Wright, *supra*, § 125, at 543-44 (footnote omitted).

### 3. *Valentine* and *Dominguez*

**{36}** *Valentine* involved a defendant convicted in state court with twenty counts of child rape and twenty counts of felony sexual penetration of a minor. 395 F.3d at 629. The habeas proceedings Valentine brought in the federal courts focused on his indictment.

**{37}** Each of the twenty counts of rape alleged in Valentine's indictment stated only that "Valentine 'unlawfully engaged in sexual conduct with [the victim] . . . by purposely compelling her to submit by the use of force or threat of force, [the victim] being under the age of 13 years . . . .'" *Id.* Crucially, "[n]o further information was included to differentiate one count from another." *Id.* Similarly, each of the twenty felonious-sexual-penetration counts was identical and alleged "that Valentine 'unlawfully without privilege to do so inserted a part of the body, an instrument, apparatus or other object to-wit: finger, into the vaginal or anal cavity of another, to-wit: [the victim] . . . .'" *Id.* (citation omitted). Again, no further information was given to differentiate the sexual penetration counts. *Id.* The Sixth Circuit determined, in a divided opinion, that this indictment was inadequate and violated the defendant's due process and double jeopardy rights, and the court dismissed all but one count of child rape and one count of felony sexual penetration of a minor. *Id.* at 635-39.

**{38}** As to due process, the majority in *Valentine* observed that *Russell* made clear that "criminal charges must give a defendant adequate notice of the charges in order to enable him to mount a defense." *Id.* at 631. Valentine's indictment did not do this. The majority explained that "within each set of 20 counts there are absolutely no distinctions made." *Id.* at 632. The majority went on to reiterate this point several times using different words to do so.

**{39}**     The indictment, they noted, "did not attempt to lay out the factual bases of forty separate incidents that took place." *Id.* "[T]he criminal counts were not," they stressed, "connected to distinguishable incidents." *Id.* at 633.  The prosecution failed, the majority said, "to disaggregate the whole of the abuse." *Id.* at 634.  Because of this, the defendant was not, the majority claimed, "apprise[d] . . . of what occurrences formed the bases of the criminal charges he faced." *Id.*  In the final analysis, Valentine did not have, the majority determined, "notice of the multiple incidents for which he was tried and convicted." *Id.*  The majority then turned to the double jeopardy inquiry.

**{40}**     After discussing the principles articulated in *Russell* about indictments and double jeopardy, the majority concluded that Valentine's double jeopardy rights were also plainly violated.  *Valentine*, 395 F.3d at 635-36.  The crucial distinction between the circumstances in *Russell* and *Valentine*, the majority explained, was that "[i]n [Valentine's] case, there was no specificity regarding the factual offenses Valentine allegedly committed." *Id.* at 635.  This was determinative because "the charges were not linked to differentiated incidents, [and] there is resulting uncertainty as to what the trial jury actually found." *Id.* at 636.

**{41}**     Before proceeding further, it is worth pausing here and noting that we can see the validity of Wright's observation that the double jeopardy protection identified in *Russell* does nothing in practice that the due process protection does not already provide.  These two inquiries effectively collapsed into one question in *Valentine*.  The inquiry under either due process or double jeopardy was the same: whether the charges filed against Valentine were sufficiently differentiated.

**{42}**     A dissenting opinion in *Valentine* took issue with what it perceived to be an obvious and undesirable consequence of the majority's analysis: after *Valentine*, the dissent protested, the charging documents in child sex abuse cases would be required to provide "exact time and place specifications." *Id.* at 640 (Gilman J., concurring in part, dissenting in part).  This, the dissent was certain, "would severely hamper a state's ability to prosecute crimes where a young child is both the victim and the sole witness." *Id.*  The majority disagreed with this critique.

**{43}**     The majority conceded that "[t]he exigencies of child abuse cases necessitate considerable latitude in the construction of criminal charges[,]" and explained that all that was required of charging documents in resident child molester cases was some form of "minimal differentiation between criminal counts." *Id.* at 636-37.  This minimal differentiation could be satisfied, the majority explained, by the provision of "time ranges or certain locations or certain actions." *Id.* at 637.  This differentiation, the majority made clear, "does not require overly-burdensome precision." *Id.*  To illustrate, the majority discussed *State v. Mulkey*, 560 A.2d 24 (Md. 1989), a case that avoided the due process and double jeopardy concerns that, in the majority's view, fatally infected *Valentine*.

**{44}**     *Mulkey* involved two victims and a defendant charged with twelve child sex abuse counts.  *Valentine,* 395 F.3d at 637-38*.*  Four of the counts alleged were

identified as having occurred one summer, four others the following summer, and the last four the summer following that. *Id.* The twelve counts also specified that the defendant committed three instances of two types of sex acts against each of the two child victims. *Id.* at 638. This time and act specification was enough, the majority explained, to "ensure differentiation among the otherwise similar counts." *Id.* We turn now to *Dominguez.*

**{45}** The indictment at issue in *Dominguez* pleaded ten identical counts. 2008-NMCA-029 ¶ 2. The count, repeated ten times, alleged that

> [O]n or between August 25, 2002 and October 31, 2002 . . . [Dominguez] did unlawfully and intentionally touch or apply force to the intimate parts of [the victim], and [the victim] was a child under thirteen (13) years of age, contrary to NMSA 1978, Section 30-9-13A(1) [sic].

*Dominguez*, 2008-NMCA-029, ¶ 2 (first, third, and fourth alterations in original). The defendant moved pretrial to dismiss the indictment on grounds that it violated his due process rights. *Id.* ¶ 3. The State filed a bill of particulars to clarify the factual bases for the ten counts, but the district court accepted that there was a factual basis for only five. *Id.* ¶ 4. This ruling was appealed, and the Court of Appeals affirmed. *Id.* ¶ 1.

**{46}** The Court of Appeals was persuaded that Dominguez's case was effectively identical to *Valentine. Dominguez*, 2008-NMCA-029, ¶ 10. In both cases, the Court explained, there was a fatal lack of specificity in the indictment. *Id.* In Dominguez's case, "the charges in the indictment provided sufficient notice and protected [Dominguez] from double jeopardy only insofar as the State was able to describe separate incidents in the bill of particulars." *Id.* The bill of particulars could only tether five of the ten counts to specific charges. *Id.* The Court concluded that "the trial court properly dismissed those counts of the indictment that could not be linked to individual incidents of abuse." *Id.* ¶ 14.

### 4. Application of the principles arising from *Russell, Valentine,* and *Dominguez*

**{47}** Lente's indictment alleges that he engaged in specific sex acts with M.C. during specific, consecutive, six-month intervals. No specific form of sexual abuse was alleged to have occurred more than once in any given interval. In other words, only one count of fellatio is alleged in each six-month interval where fellatio is alleged to have occurred. The charges proceed in this fashion with respect to all of the varying sex acts that Lente perpetrated upon M.C. This charging practice eliminates the concerns that arose in *Valentine* and *Dominguez.*

**{48}** We do know, based on the indictment, what specific sex acts Lente was alleged to have committed. There is no uncertainty between the charges in the indictment and the jury's findings. We know what the jury's findings mean and can correlate them to specific counts. Lente's jury believed that Lente committed all of the specific and

identifiable sex-abuse crimes which the charges alleged Lente perpetrated against M.C. during any six-month interval.  There is no confusion.

**{49}**   To put this all in slightly different words, the indictment here *does not* include "carbon-copy" counts, i.e. identically worded charges that are in no way differentiated from one another.  *Valentine*, 395 F.3d at 628.  The charges here, unlike those in *Valentine* and *Dominguez*, were more than adequately differentiated to avoid the double jeopardy problems associated with unspecific, "carbon-copy" indictments and, therefore, the results in *Valentine* and *Dominguez* do not apply.  Moreover, Lente did not raise notice objections to the indictment, and as the authority cited above makes clear, where an indictment presents no notice problem the indictment will produce no double jeopardy concern.

**B.      Sufficiency of the Evidence and Lente's Convictions**

**{50}**   The district court concluded that Lente's multiple convictions violate double jeopardy.  As noted earlier, the court thought M.C.'s testimony too unspecific to support independent, discrete convictions.  That testimony could only support, the court determined, one single course-of-conduct conviction.  Because only one course-of-conduct conviction could stand, Lente's multiple convictions violate double jeopardy, or so the court reasoned.

**{51}**   The court evaluated Lente's multiple convictions from a unit of prosecution perspective.  *See generally State v. Ramirez*, 2018-NMSC-003, ¶¶ 44-58, 409 P.3d 902.  As we said previously, the court was not concerned with the unit of prosecution for CSP and CSCM or whether the distinct forms of CSP and CSCM Lente perpetrated upon M.C. on different dates over a period of years produced a unitary conduct problem.  Rather, the court's concern was with the evidence presented to support each conviction.  This is an appropriate concern.

**{52}**   "The Double Jeopardy Clause . . . protects against multiple punishments for the same offense."  *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citation omitted).  "[O]nce past the unit of prosecution test, a properly instructed jury must still find, subject to our traditional deferential review, that substantial evidence supports each separate [conviction]."  *State v. Gallegos*, 2011-NMSC-027, ¶ 50, 149 N.M. 704, 254 P.3d 655.  "[O]ur primary concern in this context is to ensure that sufficient evidence exists to establish that each penetration is distinct from the others."  *State v. McClendon*, 2001-NMSC-023, ¶ 5, 130 N.M. 551, 28 P.3d 1092.

**{53}**   For the reasons that follow, we conclude that the evidence presented in Lente's case was sufficient to support his multiple sex-crime convictions.  In turn, we (1) clarify the nature of a reviewing court's inquiry when engaged in sufficiency review, (2) evaluate how these standards apply in resident child molester cases given the unique proof problems and policy concerns implicated by these cases, (3) review the evidence presented at Lente's trial, and (4) assess whether that evidence was sufficient under the appropriate standards.

## 1.     Standard of review: sufficiency

**{54}**     Sufficiency review is an "essentially" legal endeavor and "addresses whether the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (internal quotation marks and citation omitted). "The reviewing court considers only the legal question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 314-15 (1979)); *accord State v. Graham*, 2005-NMSC-004, ¶¶ 6-7, 137 N.M. 197, 109 P.3d 285 (discussing the sufficiency standard in some depth and quoting *Jackson* about the limited inquiry in which this Court engages under sufficiency review); *State v. Kersey*, 1995-NMSC-054, ¶ 11, 120 N.M. 517, 903 P.2d 828 ("We test sufficiency of the evidence in a criminal case under the standard set by the United States Supreme Court in *Jackson* . . . ."). Our review is "limited" to ensure that we do not "intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Musacchio*, 136 S.Ct. at 715 (internal quotation marks and citation omitted)*.*

## 2.     Sufficiency review in resident child molester cases

**{55}**     As earlier noted, child victims in resident child molester cases "typically testif[y] to repeated acts of molestation occurring over a substantial period of time" but are generally unable to furnish "specific details, dates or distinguishing characteristics as to individual acts or assaults." *Jones*, 792 P.2d at 645. This is for the following nonexhaustive list of reasons.

**{56}**     First, unlike adults, children cannot easily link experiences to dates or other specific points in time. *See* Lindsay Wandrey et. al., *Maltreated Children's Ability to Estimate Temporal Location and Numerosity of Placement Changes and Court Visits*, 18 Psychol. Pub. Pol'y & L. 79, 82-83 (2012); *accord Baldonado*, 1998-NMCA-040, ¶ 20 ("[I]t is not difficult to appreciate that [y]oung children cannot be held to an adult's ability to comprehend and recall dates and other specifics." (second alteration in original) (internal quotation marks and citation omitted)).

**{57}**     Second, when sexual abuse is repeated and frequent, isolating any particular instance of abuse becomes a significant challenge for child victims. *Jones*, 792 P.2d at 648. "The more frequent and repetitive the abuse, the more likely it becomes that the victim will be unable to recall specific dates and places." *State v. Arceo*, 928 P.2d 843, 868 (Haw. 1996) (internal quotation marks and citation omitted). "[E]ven a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance." *Jones*, 792 P.2d at 648.

**{58}**     Third, children may subconsciously "desire to 'forget' the abuse," and this may explain why they make forgetful, unretentive, and perhaps even unintentionally uncooperative witnesses. *Valentine*, 395 F.3d at 640 (Gilman J., concurring in part,

dissenting in part); *see Brown*, 780 P.2d at 885. Some suggest that Child Sexual Abuse Accommodation Syndrome[1] explains why children who have been subjected to sexual abuse by a parent or caregiver make poor witnesses. *See generally People v. Patino*, 32 Cal. Rptr. 2d 345, 347-48 (Cal. Ct. App. 1994).

**{59}**   Fourth, children have limited exposure to sexual activity and limited vocabularies and are, therefore, incapable of testifying about sexual anatomy and sexual encounters with the specificity expected of adults. *Patrick v. State*, 495 So. 2d 112, 114 (Ala. Crim. App. 1986); *State v. Martens*, 569 N.W.2d 482, 487 (Iowa 1997). Because young children who suffer repeated sexual abuse by household members or other caretakers make less than ideal witnesses, reviewing courts confronted with sufficiency challenges in these cases face difficult questions.

**{60}**   The defendant's conviction can be sustained only if supported by substantial evidence. *State v. Montoya*, 1984-NMSC-073, ¶ 4, 101 N.M. 424, 684 P.2d 510. Yet and as we have just described, child victims of resident child molesters cannot produce specific accounts of their abuse. So, what are courts to do when the only witness in the case testifies to repeated, continuous, but vague and unspecific instances of repeated sexual abuse? How are these "paradoxical, proof problems" to be reconciled? *Jones*, 792 P.2d at 648. How are appellate courts "to resolve the tension between the rights of an alleged victim and the rights of an alleged child molester"? *R.A.S. v. State*, 718 So. 2d 117, 119 (Ala. 1998) (internal quotation marks and citation omitted).

**{61}**   Some authorities hold that "purely generic testimony regarding molestations cannot be regarded as substantial evidence" and further hold that when such evidence is all that is provided "this defect both requires reversal of the conviction and bars retrial of those offenses." *Jones*, 792 P.2d at 654. Other authorities reject this conclusion because it (1) produces intolerable policy consequences and (2) incorrectly conceptualizes the minimum quantity of proof necessary to sustain the types of convictions typically arising from resident child molester cases. We are persuaded that the latter of these authorities is correct and that the two reasons given for the position the authorities take are meritorious.

**{62}**   As to policy consequences, the conclusion that a child victim's testimony is per se insufficient to support convictions in resident child molester cases effectively insulates the most egregious child molesters from prosecution for multiple crimes, functions as an arbitrary detriment to those molesters "who happen to select victims with better memories," and creates an atmosphere where "one act offenders" are

---

[1]Child Sexual Abuse Accommodation Syndrome is offered as a theory to "explain why some child victims of sexual abuse delay reporting sexual offenses to adults, refrain entirely from reporting the abuse, or retract their allegations prior to trial." *State v. J.R.*, 152 A.3d 180, 183 (N.J. 2017). According to some, child victims who show symptoms of the syndrome exhibit five different types of behavior: "secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction and recantation." *Id.* at 186 (internal quotation marks omitted). Prosecutors in resident child molester cases often seek to elicit expert testimony the child victim suffers from the syndrome, and the admissibility of that testimony is a frequently litigated subject that is rife with disagreement. *See id.* at 191.

treated in the same manner as repeat molesters.  *Brown*, 780 P.2d at 886.  We join the many other jurisdictions who have already determined that this outcome must be avoided.  *See State v. Stephen J.R.*, 72 A.3d 379, 388 (Conn. 2013) ("This court will not impose a degree of certitude as to date, time and place that will render prosecutions of those who sexually abuse children impossible.  To do so would have us establish, by judicial fiat, a class of crimes committable with impunity."); *Commonwealth v. Kirkpatrick*, 668 N.E.2d 790, 795 (Mass. 1996) ("Clearly, the rule proposed by the defendant, which would have limited or foreclosed prosecution in this case, might effectively insulate the most egregious offenders from prosecution." (footnote omitted), *overruled on other grounds by Commonwealth v. King*, 834 N.E.2d 1175 (2005)); *Commonwealth v. Groff*, 548 A.2d 1237, 1242 (Pa. Super. Ct. 1988) ("When a young child is the victim of a crime, it is often impossible to ascertain the exact date when the crime occurred.  He or she may have only a vague sense of the days of the week, the months of the year, and the year itself.  If such children are to be protected by the criminal justice system, a certain degree of imprecision concerning times and dates must be tolerated." (citations omitted)); *State v. Hayes*, 914 P.2d 788, 796 (Wash. Ct. App. 1996) ("To hold as a matter of law that generic testimony is always insufficient to sustain a conviction of a resident child molester risks unfairly immunizing from prosecution those offenders who subject young victims to multiple assaults."); *State v. Sirisun*, 279 N.W.2d 484, 487 n.4 (Wis. Ct. App. 1979) ("A person should not be able to escape punishment for such a . . . crime because he has chosen to take carnal knowledge of an infant too young to testify clearly as to the time and details of such . . . activity." (internal quotation marks and citation omitted)).

**{63}**   As to the minimum quantum of proof necessary to sustain a child-sex-abuse crime, the question this and other resident child molester cases ask is whether a child "victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient."  *Jones*, 792 P.2d at 655.  The answer to this question, the California Supreme Court determined, is "[c]learly not."  *Id.*

**{64}**   "[G]eneric testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents each of which amounts to a separate offense, and *each* of which could support a separate criminal sanction."  *Id.* at 654.  "[T]he particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction."  *Id.* at 655; *see Baker v. State*, 948 N.E.2d 1169, 1174 (Ind. 2011); *State v. Reynolds*, 2018 ME 124, ¶ 23, 193 A.3d 168, 175 (2018); *State v. Swan*, 753 N.W.2d 418, 421-22 (S.D. 2008).  "Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential . . . ."  *Jones*, 792 P.2d at 656.

**{65}**   The California Supreme Court posited that these points go unrecognized and greater specificity than is necessary is required from child witnesses because of "persistent doubts about the general credibility of" child witnesses, doubts that are inappropriate and unwarranted.  *Id.* at 654-55.  This is not to say, however, that questions of credibility are not significant in resident child molester cases.  To the

contrary, "credibility is usually the true issue in these cases[.]" *Id.* at 659 (internal quotation marks and citation omitted).

**{66}** "'[T]he jury either will believe the child's testimony that [a] consistent, repetitive pattern of acts occurred or disbelieve it.'" *Id.* (quoting *People v. Moore*, 260 Cal. Rptr. 134, 144 (Cal. Ct. App. 1989)). If the prosecution persuades the jury to believe the child victim's testimony that he or she was subjected to multiple acts of sexual abuse over a long period of time, the prosecution will have necessarily "proven beyond a reasonable doubt that the defendant committed a specific act[.]" *Id.* (internal quotation marks and citation omitted).

**{67}** In the end, the California Supreme Court held that a child victim in a resident child molester case must, at a minimum, provide testimony satisfying the following three requirements for multiple convictions to survive sufficiency review.

**{68}** First, the child victim must describe the proscribed act or acts committed with sufficient specificity to establish that unlawful conduct did in fact occur and to permit a jury to differentiate between the various types of sex acts to which the child victim was subjected. *Jones,* 792 P.2d at 655-56.

**{69}** Second, the child must describe the number of proscribed acts committed with sufficient certainty to support each of the counts alleged in the information or indictment. *Id.* Statements to the effect that specific acts of sexual abuse occurred "twice a month" or "every time we went camping" are sufficient. *Id.* (internal quotation marks and citation omitted).

**{70}** Third and finally, the child must describe the general time period in which the proscribed acts occurred. *Id.* "[T]he summer before my fourth grade," or "during each Sunday morning after he came to live with us" are examples of sufficient specification. *Id.* (internal quotation marks and citation omitted).

**{71}** *Jones* emphasized two other important points that we also think worth emphasizing. First, charging documents in resident child molester cases have unique significance. *Id.* They must channel the jury's focus and require it to determine if specific instances of illegal conduct were established. A charging document achieves this end by specifying the exact sex-abuse crimes that allegedly occurred and identifying the dates or date ranges when those crimes purportedly happened. Such charges do indeed ask the jury to decide if specific, illegal sex acts took place. This point is particularly evident where the evidence elicited indicates that repeated molestations exceeding the number of specific acts charged were perpetrated, a likely occurrence in resident child molester cases. *People v. Letcher*, 899 N.E.2d 315, 323 (Ill. App. Ct. 2008).

**{72}** Second, reasonable and narrowly tailored charging documents can only exist where prosecutorial discretion is appropriately exercised. "[P]rosecutors," the California Supreme Court cautioned, "should exercise discretion in limiting the number of separate

counts charged. No valid purpose would be served by charging hundreds or thousands of separate counts of molestation, when even one count may result in a substantial punishment." *Jones,* 792 P.2d at 654. The point can, in fact, be taken a step further. Where the prosecution does not exercise appropriate discretion and charges an unreasonably excessive number of crimes and secures convictions, it contributes to the possibility that very few or possibly none of those convictions will survive appellate review.

### 3.    Evidence presented at Lente's trial

**{73}**    At the time of trial in December 2002, M.C. was thirteen and in eighth grade. Lente began abusing her when she was in second or third grade, a time when she would have been seven or eight years old. The indictment alleged that the abuse occurred for forty-and-a-half months, or more than three years. From these facts, the jury could discern that M.C. was abused between the time she was seven or eight years old and until she was eleven or twelve.

**{74}**    M.C.'s mother testified first. She recounted the events of December 13, 2000, when she walked in on Lente as he was forcing M.C. to perform fellatio. Lente apparently thought M.C.'s mother was asleep. She exited her bedroom, entered the living room, and saw Lente and M.C. "sitting on the couch and he was pushing her head down on his penis and making her suck on it." M.C.'s mother shouted at Lente. M.C. immediately began crying. Lente quickly rose and pulled up his pants.

**{75}**    The prosecution began direct examination of M.C. by inquiring whether she recalled how the sexual abuse started.

> Prosecutor:          . . .What do you remember happening the first time?
> M.C:                Like the first time it ever happened, or . . .
> Prosecutor:          The first time it ever happened.
> M.C.:               I don't remember the first time.
> Prosecutor:          Okay. What's the first thing you remember, the earliest?
> M.C.:               He would touch me and stuff like that.
> Prosecutor:          And where would he touch you?
> M.C.:               Um, everywhere, like on my privates and, you know, upper parts and stuff like that.

M.C. went on to describe how Lente would touch her breasts over her clothes; touch her vagina with his hands and mouth both over and under her clothes; insert his fingers into her vagina and "suck on them, and stuff like that"; and grab her buttocks "a lot."

**{76}**    M.C. then explained that her mother was frequently out of the house when the abuse occurred but Lente would also sometimes abuse her at night in her bed when her mother was home. After disclosing this fact, the following crucial exchange occurred between the prosecutor and M.C. pertaining to the frequency of the abuse.

| | |
|---|---|
| Prosecutor: | When it happened in your bed, do you remember how old you were or what grade you were in? |
| M.C: | It happened, you know, a lot, more than once, so different ages. |
| Prosecutor: | Are you able to talk about like how many times a week or how many times a month it would happen, or would it be different? |
| M.C.: | Maybe two to three times a week. |
| Prosecutor: | Was that the whole time or just sometimes? |
| M.C.: | Most of the time, yeah. |
| Prosecutor: | Were there ever any times that it stopped for a while? |
| M.C.: | Not really, no. |

The prosecutor then directed M.C. to the number of times Lente had her perform fellatio.

| | |
|---|---|
| Prosecutor: | Did he ever have you do anything to him? |
| M.C: | Oh, yeah—yes. |
| Prosecutor: | And what would he have you do to him? |
| M.C.: | He would have me suck on his private. |
| . . . . | |
| Prosecutor: | Do you remember what grade you were in or how old you were? |
| M.C.: | Maybe third. |
| Prosecutor: | Third grade when that started? |
| M.C.: | Probably. |
| Prosecutor: | Did that happen one time or more than one time? |
| M.C.: | A lot more than once. |
| Prosecutor: | A lot more than once? |
| M.C.: | Many. |
| Prosecutor: | Many times? |
| M.C.: | (Nodding.) |
| Prosecutor: | What did he do the most? |
| M.C.: | Probably make me suck on him. |

The prosecutor then asked M.C. to discuss the digital penetration.

| | |
|---|---|
| Prosecutor: | And you talked about him putting his fingers inside you? |
| M.C.: | Yes. |
| Prosecutor: | When did that start?  What grade were you in? |
| M.C.: | Maybe around third or fourth. |
| . . . . | |
| Prosecutor: | How many times do you think he did that? |
| M.C.: | A lot, I don't— |

| Prosecutor: | Besides your bed at night, where else did he do these things? |
| M.C.: | In the living room, in his room. |

**{77}** It is worth pausing here and considering Lente's objections to M.C.'s testimony. He characterizes her testimony as unspecific and wholly deficient, and he insists that the State was required to "disaggregate the whole of the abuse by eliciting specific time, conduct and location testimony regarding each charged count." M.C.'s testimony reveals her to be the paradigmatic victim of a resident child molester. She explains at many points in her testimony that she cannot specify the number of times particular sex acts occurred because they occurred with such frequency. Lente's objections to her testimony in no way acknowledge that M.C. (and children like her) cannot do what Lente insists must occur. Moreover, Lente fails to acknowledge that M.C.'s inability to provide specific details about her abuse is, in part, a product of his own making. He sexually abused M.C. so frequently that the details of particular abuse are clouded in her mind. He created a circumstance and now complains of its existence. He seeks to transform his repeated violations of the criminal laws into a shield.

## 4. Assessing the sufficiency of the evidence

**{78}** We must first decide whether M.C. described the criminal acts perpetrated upon her with sufficient specificity to establish that Lente did in fact perform criminal sexual abuse and to permit Lente's jury to differentiate between the various types of criminal sexual abuse committed. M.C. testified that Lente: touched her buttocks, breasts, and vagina and touched these areas of her body both over and under her clothes; required her to perform fellatio on him; and inserted his finger(s) into her vagina. M.C.'s mother saw M.C. performing one of the instances of fellatio charged. This testimony more than adequately established that Lente forced M.C. to engage in sex acts and that he perpetrated the different and varying acts for which he was convicted.

**{79}** Second, we must answer whether M.C. described the number of sex acts committed with sufficient certainty to support each of the counts alleged in the indictment and for which Lente was convicted. We address the CSP convictions for fellatio and digital penetration separately and the CSCM convictions collectively.

**{80}** Lente was convicted of six counts of CSP for requiring M.C. to engage in fellatio. All of the fellatio charges were alleged to have occurred in the last twenty-and-one-half months of the nearly forty-and-one-half months the indictment spanned. M.C. testified that the first time she was asked to perform fellatio on Lente was around the time she began third grade. As a very general matter, M.C. testified that Lente sexually abused her two to three times a week beginning in her second or third grade year and that the abuse persisted in this fashion for years. M.C. estimated that she performed fellatio on Lente more than fifty times and added that it was the most common form of abuse to which she was subjected. The last (chronologically) of the six CSP fellatio convictions was more than adequately supported by M.C.'s mother's testimony that she observed M.C. performing fellatio on Lente. So, was M.C.'s testimony sufficient to permit the jury

to find that Lente forced her to perform fellatio five other times during the twenty-and-one-half months the indictment alleged those fellatios occurred?  The answer is clearly yes.

**{81}**  Lente was convicted of four counts of CSP for inserting his finger(s) into M.C.'s vagina.  The digital penetration counts in the indictment were all also alleged to have occurred in the last twenty-and-one-half months of the overall charging period.  M.C. testified that Lente began penetrating her vagina with his finger(s) in the third or fourth grade.  As noted, M.C. stated that the sexual abuse persisted for years after the time the digital penetration began and occurred two or three times a week.  M.C. estimated that Lente penetrated her vagina with his finger(s) more than fifty times.  Is this testimony sufficient evidence to support the finding Lente penetrated M.C.'s vagina with his finger(s) four times over a twenty-and-one-half month charging period?  Again, we think the answer is clearly yes.

**{82}**  As to the CSCM convictions, Lente was convicted of five counts for touching M.C.'s vagina, five counts for touching her breasts, and six counts for touching her buttocks.  Unlike the CSP counts, the varying CSCM charges were alleged to have occurred throughout the majority of the forty-and-one-half months the indictment covered.  M.C. testified that the sexual abuse began with Lente touching her vagina, breasts, and buttocks.  She clarified that this touching occurred both over and under her clothing.  As noted, she stated that Lente abused her two or three times a week for the duration of the time she was abused.  M.C. approximated that Lente touched her buttocks "around five" times, touched her breasts more than five times, touched her breasts with his mouth more than five times, and touched her vagina (apart from the times he penetrated it with his fingers) twenty times.  Is this testimony sufficiently specific support for the jury's finding that Lente touched M.C.'s vagina and breasts five times each and her buttocks six times in forty-and-one-half months?  Once more, the answer is plainly yes.

**{83}**  Moving to the third and last part of the sufficiency analysis, we must evaluate whether M.C. described the general time period in which the proscribed acts occurred.  As we have pointed out several times now, M.C. testified that the abuse occurred two or three times a week for almost the entirety of the forty-and-one-half month indictment period.  This statement is not meaningfully different than a child's estimation that sex abuse occurred each summer or each camping trip.  M.C.'s statements are different only in that they prove she was subjected to significant amounts of abuse, amounts perhaps far in excess of what other children in these types of cases experience.

**{84}**  We conclude that the evidence offered in support of the convictions was sufficient.  This conclusion eliminates the double jeopardy violation the district court thought occurred here.

## III.    CONCLUSION

**{85}** The district court's order granting Lente's habeas petition and vacating his convictions is reversed. This matter is remanded for proceedings consistent with this opinion.

**{86}  IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**