The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: September 11, 2025

**No. A-1-CA-41730**

**STATE OF NEW MEXICO,**

　　　Plaintiff-Appellee,

v.

**JOSE JORGE ROMANIS-BELTRAN**
**a/k/a JOSE ROMANIS-BELTRAN,**

　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Clara Moran, District Court Judge**

Raúl Torrez, Attorney General
Teresa Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

The Law Office of Scott M. Davidson, Ph.D., Esq.
Scott M. Davidson
Albuquerque, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}      A jury convicted Defendant Jose Jorge Romanis-Beltran on ten counts arising from allegations that he sexually abused his stepdaughter (Victim) over a period of more than ten years. On appeal, Defendant argues that the admission of out-of-court statements made by Victim to Maryanne Chavez, a sexual assault nurse examiner (SANE), violated his confrontation rights under the Sixth Amendment of the United States Constitution, which "bars the admission at trial of testimonial statements of an absent witness unless [they are] unavailable to testify, and the defendant has had a prior opportunity to cross-examine [them]." *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (alteration, internal quotation marks, and citation omitted). After extensive review, the district court excluded many of Victim's out-of-court statements to Chavez but found that others were "medically relevant" and therefore nontestimonial and admissible through Chavez, pursuant to our Supreme Court's decisions in *State v. Tsosie*, 2022-NMSC-017, 516 P.3d 1116, and *State v. Romero*, 2007-NMSC-013, 141 N.M. 403, 156 P.3d 694. After reviewing the relevant surrounding circumstances of the sexual assault examination and conducting an inquiry into the statements and actions of Victim and Chavez, we hold that the primary purpose of most of the statements was testimonial. *See Tsosie*, 2022-NMSC-017, ¶ 75. To remedy the resulting constitutional violation, we reverse Defendant's convictions

and remand for a new trial. *Cf. id.* ¶ 114. As a result, we decline to address Defendant's additional arguments related to prosecutorial misconduct and cumulative error.

**BACKGROUND**

**I.    Factual Background**

{2}    We take the following factual recitation from the testimony of the State's witnesses at trial. On August 1, 2020, Defendant and his wife, Belen Lopez (Mother), lived together with their two sons and Victim, who is Mother's biological daughter and as we have noted, Defendant's stepdaughter. Mother testified that after one of her sons woke her in the early morning hours of August 2, 2020, she went into the kitchen and "saw [Defendant]'s face or head and shoulder," presumably on the living room couch, "sort of leaning, leaning toward the front, toward his front." Mother believed that Defendant saw her approaching, and when Mother came around a wall into the living room, Defendant "was on his feet" and Victim "was on the couch, covered with a blanket." Defendant's clothes were on, but when Mother removed the blanket, she saw that Victim was naked from the waist down. Mother screamed at Defendant and told him to leave. Mother then asked Victim, "Has this happened before?" and Mother testified that Victim "nodded, yes." Suspecting sexual abuse, Mother called the police.

**{3}**     The detective assigned to the Crimes Against Children Unit of the Albuquerque Police Department (the Detective) testified that on August 2, 2020, he received a phone call at approximately 4:00 a.m. from the officer who responded to Mother's call. Based on the information the responding officer gave him, the Detective told the officer to arrange an appointment for a sexual assault examination, which is also often referred to as a "SANE exam." After the officer set up an appointment, the Detective "met the officer and [Mother] at the Family Advocacy Center . . . where the SANE exams are conducted." The Detective did not see Victim at the Family Advocacy Center because by the time he arrived, "she was with the SANE nurse for intake." While Victim was in a separate room with Chavez, the Detective interviewed Mother for twenty to thirty minutes. At some point during the Detective's questioning of Mother, Chavez "step[ped] into the lobby" and "later went back in to finish up the exam." The Detective testified that he never spoke with Victim at the Family Advocacy Center.

**{4}**     The Family Advocacy Center houses two different clinics: Para Los Niños and the Albuquerque SANE Collaborative (ASC). Para Los Niños "specializes in the care of children when there are concerns for sexual abuse," and ASC evaluates individuals of any age who have reported a sexual assault. Chavez worked for both Para Los Niños and ASC, and after she became a nurse practitioner, her scope of practice with both clinics included medical diagnosis.

{5} Chavez received a call from law enforcement and arrived at the Family Advocacy Center to begin the examination of Victim at 6:00 a.m. on August 2, 2020. For the examination, Chavez, Victim, and an unidentified "advocate" were present in the room. Because Victim did not testify, the statements that Victim made to Chavez are at the heart of Defendant's Confrontation Clause claim. In relevant part, the following statements were read by Chavez to the jury at trial. Quotation marks indicate when Chavez recited words—either her own or Victim's—to the jury that she had recorded during the sexual assault examination.

Chavez: I asked, "How old were you the first time something happened?" Response, "I think I was six. Just touching. I remember him moving really fast. We were with his relatives. He moved really fast and stopped. He was touching me." I asked, "The touching, at six, was it on top of clothes, under clothes, or something different?" She responded, "I want to say on top of clothes."

. . . .

State: What's the next thing you asked about?

Chavez: "What was the first memory you have of it being different?" . . . She said, "Seven or eight. He wanted to do something to me, harm me. It started hurting. He was trying to injection himself. His penis. It hurt. This one time he tied me up."

. . . .

She said, "This one time he tied me up." I asked, "How old?" She responded, "I was seven or eight. He tied my legs. He tied my ankles and I was bent down. He raped me, but he did it in my butt. I'm sure it hurt. That kept going

on in the butt. He'd do it once a month. Mom was always at work. The next time I remember was fifth grade. He made me believe it was okay. That time he wanted to inject himself in my vagina. He attempted many times, but I'd cry and beg, please. He'd stop, apologize, and say he didn't mean it. It would go like that. In fifth grade, he was successful. He bought me a voice diary to make me happy. Little by little, he'd tell me—I was—he told me he'd stop. He'd cry and say he's going to stop. I believed him. He said it ten times in the trailer we lived in, in the Four Hills area. That kept happening."

. . . .

I asked her if she was worried that she would become pregnant," She said, "Yes. Before, he would pull out. He started pulling out when I was thirteen. He used condoms before that. He hid the condoms in the car. He was really sneaky. He said, "You'll be fine." He got bored with that, then started letting the sperm enter my body. I was twelve to thirteen, and I had my period. He would buy the morning-after pill, and I was willing to. I begged him to buy it."

. . . .

State:    Okay, and then what did she go on to tell you?

Chavez:   "Later down the line, between the ages from ten to twelve, he was going, he said he was going to have intercourse with someone else, so I wouldn't have to do it anymore. It was weird. He'd take me to the park. He would meet with women. I was at the park. I grew up at fifteen. One day it just hit. I realized. I got depressed."

. . . .

State:    So, what was the next—what was the next thing that was said?

Chavez: She responded, "My brother saw him touching me. He said, 'it was weird.' I was watching Princess and the Frog. He was"—and in parentheses, I have, "stepdad—was touching me. My brother ran to my mom. I thought he was getting a charger. He started to do more. Oral to me. My brothers stayed in the other room. I heard them coming fast. It was my mom." Exclamation points. "She went to see—saw something. She knew something was wrong.

State: I—I'm sorry. I was going to say—and then what else?

Chavez: "I was scared. I thought I'd die the day she found out. I just stood there. It was okay. I wasn't scared. She asked me. She threw him out. Then I told her."

After "taking history," Chavez brought Victim "back to a medical exam room and put her in a hospital gown so I could check her body." Chavez's physical exam revealed abrasions in Victim's vagina. Chavez tested Victim for certain sexually transmitted infections, and the results were positive for one infection. Chavez agreed that the presence of a sexually transmitted infection was "diagnostically significant." Though Chavez instructed that Victim should return for a follow-up appointment, she never did.

## II.    Procedural Background

{6}    Based on Victim's statements during the sexual assault examination and a later forensic interview, a grand jury indicted Defendant on twenty-three counts, including two counts of criminal sexual contact of a minor (CSCM), nine counts of first degree criminal sexual penetration (CSP 1), nine counts of second degree criminal sexual penetration (CSP 2), and one count each of aggravated battery,

contributing to the delinquency of a minor, and child abuse. The indictment alleges CSCM beginning in 2010, followed by CSP counts for the date range spanning from 2012 to 2020. The remaining counts were tied specifically to instances of conduct including strangulation, showing Victim pornography, and supplying emergency contraceptive pills "to hide sexual assault."

{7}     The question of whether Victim would testify at trial arose for the first time when Defendant requested a bill of particulars. At a hearing on the motion, the State asserted that "[V]ictim is not gonna show up for a pretrial interview," and although Victim "could change her mind and decide she d[id] want to testify," the State was "under the impression" that trial would proceed "without her." At the district court's request, the State filed a document listing the counts on which it would proceed if Victim did not testify. The filed document amended the date range for one of the CSP counts and the child abuse count and listed the fourteen counts that the State would pursue if Victim did not testify.

{8}     Based on the State's representations at the hearing and in its bill of particulars, Defendant filed a motion "to exclude hearsay testimony by" Chavez and argued that the admission of "any portion" of the report from the sexual assault examination or testimony by Chavez "that contains testimonial evidence . . . is inadmissible as hearsay, and . . . would violate the confrontation clauses of the federal and New

Mexico constitutions."[1] In response, the State requested a hearing to "present testimony from" Chavez in order to "explain[] the medical significance of each aspect of her exam of [Victim]."

{9} An evidentiary hearing conducted over three settings followed, during which the State presented the testimony of Chavez, and Defendant presented the testimony of Leticia Sprinkle, a registered nurse who was qualified to perform sexual assault examinations. The experts agreed that while a sexual assault examination may be focused on the assessment of injuries resulting from a somewhat recent event, Chavez, as a nurse practitioner, had a broader scope of practice that included medical diagnosis and treatment. During and after the testimony, the parties went line-by-line through the SANE report, to determine whether Chavez's questions were "medically relevant."

{10} The district court ultimately concluded that most of the statements that Defendant challenged were admissible. The district court determined that

a. Ms. Chavez is a family nurse practitioner and a psychiatric mental health nurse practitioner who is able to diagnose and treat under her own license.

---

[1]During the proceedings, the district court and the parties referred to both the SANE report and the SANE chart. These appear to be the same document—the report from the sexual assault examination. This report was highlighted and marked to show the district court's eventual rulings on the admissibility of the statements that the report contained. We refer to the document as the SANE report. The district court suggested that the parties file a copy of the document under seal to assist with any review by this Court. The parties did not do so, and so our review is based entirely on the oral representations of the report at the hearings and the trial.

b. The use of the SANE form does not prevent Ms. Chavez from testifying to the child's full medical history.

c. Ms. Chavez was the first medical provider this child saw and had not before provided any medical history regarding her sexual abuse.

d. The time frame from the last abusive event and the age of the child would not require [Chavez] to only take history for the acute abusive event because [Chavez] is able to diagnose and treat.

The order then memorialized the district court's rulings as to the admissibility of the information and statements appearing in the SANE report. The order identifies by page the statements that were and were not admissible based on their medical relevance and Chavez's testimony, citing our Supreme Court's decisions in *Tsosie*, *Romero*, and *State v. Mendez*, 2010-NMSC-044, 148 N.M. 761, 242 P.3d 328, as well as Rule 11-803(4) NMRA (providing an exception to the rule against hearsay for a statement made for medical diagnosis or treatment), and in one instance, Rule 11-403 NMRA (providing for the exclusion of relevant evidence for unfair prejudice, confusion, and waste of time, among others). Although the district court ruled on the admissibility of the challenged statements, it was made clear that Defendant could renew objections at trial, particularly in relation to the evidentiary rules.

{11} A few days before trial, the State dismissed ten counts from the original indictment. The thirteen remaining counts included five counts of CSP 1, five counts

of CSP 2, and one count each of CSCM, aggravated battery, and child abuse. At trial, Chavez testified consistently with the district court's pretrial admissibility rulings. After the State rested its case, the district court granted the State's requests to amend the charging period for one count and the specific conduct alleged in another, and granted Defendant's motion for a directed verdict as to two other counts. The aggravated battery count was dismissed based on the State's stipulation that the statute of limitations for that charge had expired. The counts were renumbered, ten counts were submitted to the jury, and Defendant was convicted on each of those counts. The district court sentenced Defendant to sixty-six years of imprisonment. Defendant appeals.

**DISCUSSION**

{12}     As we have noted, the main issue on appeal is whether Chavez's testimony that relayed Victim's out-of-court statements to the jury was admissible under the Confrontation Clause. "Whether out-of-court statements are admissible under the Confrontation Clause is a question of law, subject to de novo review." *Tsosie*, 2022-NMSC-017, ¶ 23 (alteration, internal quotation marks, and citation omitted).

## I. The Confrontation Clause and Testimonial Statements

{13}   In a criminal prosecution, the Confrontation Clause provides the accused the right "to be confronted with the witnesses against [them]." U.S. Const. amend. VI.[2] The United States Supreme Court has explained that "the principal evil at which the Confrontation Clause was directed was . . . [the] use of ex parte examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 50 (2004). The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. To that end, "the Clause bars the admission at trial of an absent witness's statements—however trustworthy a judge might think them—unless the witness is unavailable and the defendant had a prior chance to subject her to cross-examination." *Smith*, 602 U.S. at 784.

{14}   This bar on the admissibility of an absent witness's statements, however, "applies only to testimonial hearsay—and in that two-word phrase are two limits." *Id.* (internal quotation marks and citation omitted). First, "the Clause confines itself

---

[2]Defendant cites both the federal and state constitutions. We limit our analysis to the Sixth Amendment because the protections of the federal Confrontation Clause are "made obligatory on the [s]tates by the Fourteenth Amendment," *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and Defendant makes no separate argument that Article II, Section 14 of the New Mexico Constitution requires different or greater protections, *see State v. Gomez*, 1997-NMSC-006, ¶¶ 19, 21, 122 N.M. 777, 932 P.2d 1 (describing and adopting the interstitial approach to state constitutional interpretation).

to testimonial statements." *Id.* (internal quotation marks and citation omitted). And second, "the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted." *Id.* at 785 (internal quotation marks and citation omitted). The parties appear to agree that Victim's statements to Chavez were hearsay, *see* Rule 11-801(C) NMRA (defining hearsay), and Defendant does not argue that the district erred in determining that the contested statements were otherwise admissible under the exception to the rule against hearsay for statements made for medical diagnosis or treatment, *see* Rule 11-803(4). Defendant instead argues that the statements were testimonial and the State did not establish that Victim was unavailable. We first briefly address unavailability.

{15}   We agree with the State that Defendant incorrectly "deems [Victim's] unavailability a prerequisite to the statements' admissibility" under the Confrontation Clause. The admission of nontestimonial statements does not implicate the Confrontation Clause, regardless of whether the declarant is available or unavailable to testify. *See Tsosie*, 2022-NMSC-017, ¶ 114 ("Where a statement has been determined to be nontestimonial, the admissibility of that statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (alteration, internal quotation marks, and citation omitted)).[3] We therefore focus our

---

[3]We note, however, without findings that the declarant was unavailable and was otherwise subject to cross-examination, if a district court's nontestimonial determination is reversed, a reviewing court must conclude that the defendant's

attention on the second part of Defendant's argument—that Victim's statements to Chavez were testimonial.

{16}     Defendant argues that (1) none of Victim's statements to Chavez should have been admitted; (2) Victim's statements "regarding events that preceded July 31, 2020," were testimonial; and (3) "[e]ven if there was some tendril of medical purpose for [Victim]'s statements about the events on July 31, 2020 and August 1, 2020," ten specific statements—including some related to the 2020 events—"are much more about developing evidence to support a criminal prosecution of [Defendant] than any remote medical purpose." Based on these arguments, we use the term "historical statements" to refer to conduct that occurred before July 31, 2020, and the term "immediate statements" to describe conduct that occurred on and after July 31, 2020.

{17}     Deciding whether out-of-court statements are testimonial or nontestimonial involves "determin[ing] the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Michigan v. Bryant*, 562 U.S. 344, 370 (2011) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). The *Bryant* Court emphasized that "the relevant inquiry is not the subjective or actual purpose

confrontation rights were violated, reverse the convictions, and remand for a new trial. *See State v. Navarette*, 2013-NMSC-003, ¶ 23, 294 P.3d 435.

of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360; *see also Tsosie*, 2022-NMSC-017, ¶ 96 (aligning New Mexico law with "*Bryant*'s requirement of an objective and combined inquiry into the statements and actions of the participants"). This procedure has come to be known as the "primary purpose" test. *Tsosie*, 2022-NMSC-017, ¶ 28 (internal quotation marks and citation omitted).

{18}    In *Tsosie*, our Supreme Court demonstrated how to apply the primary purpose test to statements made by an alleged victim of sexual assault to a SANE during a sexual assault examination. *See id.* ¶¶ 73-113. The *Tsosie* Court walked through a two-step objective analysis, first considering the relevant surrounding circumstances of the sexual assault examination and second evaluating the statements and actions of the participants in the sexual assault examination in light of those circumstances. *Id.* ¶ 73. In this inquiry, the *Tsosie* Court considered both the primary purpose of the sexual assault examination, *see id.* ¶¶ 77-79, 99, and the primary purpose of the statements at issue, *see id.* ¶¶ 81, 83, 114. We understand this analysis to reflect that the primary purpose of a sexual assault examination may shift. *See id.* ¶¶ 54-55. As a result, an encounter may begin with a nontestimonial primary purpose, but during that encounter, the statements may transition and take on a testimonial purpose. *Id.*

Thus, the district court must "sift[] through statements, piece-by-piece, making individual decisions on each one" to determine whether the statements and circumstances indicate that the purpose of the encounter has shifted from nontestimonial to testimonial or vice versa. *See id.* ¶ 54 (internal quotation marks and citation omitted).

{19} That is our task as well when, as here, the question on appeal is subject to de novo review and involves placing a constitutional requirement in a factual context. *See State v. Attaway*, 1994-NMSC-011, ¶ 10, 117 N.M. 141, 870 P.2d 103 (describing appellate review of a mixed question of law and fact). Importantly, the surrounding circumstances are relevant for a court to assess objectively how a declarant—the out-of-court speaker—would have viewed the primary purpose of the statements because the circumstances may inform that primary purpose. The combined inquiry then looks to the questions asked and the answers given, in light of those circumstances, to again attempt to discern how a reasonable declarant under the circumstances would have viewed the primary purpose of the out-of-court statements. Following *Tsosie*'s example, therefore, we begin the "'highly context-dependent inquiry' with objective analysis of the circumstances in which" Victim and Chavez interacted, and "then conduct an objective and combined inquiry into [their] statements and actions." *See* 2022-NMSC-017, ¶ 75 (quoting *Bryant*, 562 U.S. at 363, 370).

## A. Surrounding Circumstances

{20} The *Tsosie* Court provided examples of relevant surrounding circumstances. Those included "the time elapsed between the alleged assault and the SANE exam, the location of the SANE exam, the role of law enforcement in the SANE exam, and the identity of the SANE nurse as [the nurse's] dual role bears on the challenged statements." *Id.* We do not read these to be an exhaustive list of relevant circumstances. *See id.* (identifying relevant circumstances "here," in the case before the Court). We therefore additionally consider the events leading up to the sexual assault examination as well as the impact that age would have had on a reasonable person in Victim's position.

### 1. The Discovery and Reporting of the Sexual Abuse

{21} Together, Mother's and Chavez's testimony about the series of events leading up to the sexual assault examination suggest that the primary purpose of a reasonable participant in the examination would have been to gather evidence. At the pretrial hearing on Defendant's motion to exclude and suppress, Chavez testified about the impact of how the abuse came to light:

> This child didn't willingly disclose, it was witnessed. . . . The child was not psychologically at a place where she was ready to disclose. She decided that she was never going to. . . . I mean, a child who was ready to disclose tends to disclose more and consistently, and kind of more participatory in the process. This is a child who did not make the choice to disclose. That choice was made for her. So I think it's less likely to have the willing patient when they've not made the choice to disclose.

We perceive this testimony to demonstrate that despite any need that Victim may have had for medical care at the time that Mother discovered the sexual abuse, Victim had been unwilling to disclose what had happened to her or seek medical care. After Victim confirmed to Mother that it had happened before—testimony that Defendant does not challenge—it was Mother who called the police in response to her discovery of the sexual abuse. It was law enforcement who then arranged for the sexual assault examination. A sexual assault examination is often arranged by a third party and our Supreme Court has not viewed this type of participation by law enforcement to demonstrate a testimonial primary purpose. *See Tsosie*, 2022-NMSC-017, ¶ 80 (citing *Mendez*, 2010-NMSC-044, ¶ 37). We, however, are considering the circumstances of the present case to try to understand how a reasonable person in Victim's situation would perceive the primary purpose of the sexual assault examination. All of these facts together demonstrate that the sexual assault examination was occasioned not by disclosure and Victim's desire for medical care, but by Mother's discovery of the abuse, Mother's contacting law enforcement, and law enforcement arranging the next steps. Therefore, the circumstances surrounding the disclosure of the sexual abuse and immediately prior to the sexual assault examination do not support a nontestimonial primary purpose.

## 2. Victim's Age at the Time of the Sexual Assault Examination

{22} Victim's age at the time of the sexual assault examination also suggests that her statements during the sexual assault examination had a primarily testimonial purpose. The United States Supreme Court, in *Ohio v. Clark*, 576 U.S. 237, 247-48 (2015), determined that the declarant's age is a relevant circumstance to consider while applying the primary purpose test, at least with respect to statements made by minors. The victim in *Clark* was three years old at the time that he made statements to his preschool teachers identifying the defendant as his abuser, *id.* at 240, and the Court specifically noted that the victim's "age fortifies our conclusion that the statements in question were not testimonial," *id.* at 247. The Court observed that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause" because "[f]ew preschool students understand the details of our criminal justice system." *Id.* at 247-48. Thus, the Court concluded that it was "extremely unlikely that a 3-year-old child in [the victim]'s position would intend his statements to be a substitute for trial testimony." *Id.* at 248.

{23} In the present case, Victim was sixteen years old at the time of the sexual assault examination. While perhaps not aware of the details of the criminal justice system, a reasonable sixteen year old in Victim's position—after the unexpected discovery of sexual abuse and the ensuing involvement of law enforcement—would understand that her statements during the sexual assault examination may be used to

investigate or prosecute a crime. For this reason, Victim's age is a circumstance suggesting that the statements made during the sexual assault examination were for the purpose of gathering evidence of a crime. *See Tsosie*, 2022-NMSC-017, ¶ 81.

**3.     The Time That Elapsed Between the Conduct or Events That Victim Described to Chavez and the Sexual Assault Examination**

{24}     More complicated is the time that elapsed between the conduct that Victim's statements alleged and the sexual assault examination. *See id.* ¶¶ 76-77. It is here that distinguishing between the historical statements and the immediate statements becomes appropriate, because the historical statements describe conduct or events that occurred years before the sexual assault examination and the immediate statements describe conduct or events that occurred less than twenty-four hours before the examination. Both *Romero* and *Tsosie* are instructive to objectively evaluate the timing in relation to the two categories of statements.

{25}     Taking up the immediate statements first, *Tsosie* supports a nontestimonial purpose. In *Tsosie*, the fact that the sexual assault examination "occurred in the same night as the alleged assault" supported "the relevance of the exam to the provision of medical care" and "the primary purpose of the SANE exam being nontestimonial." 2022-NMSC-017, ¶¶ 76-77. Similarly, in the present case, the timing of the immediate statements, made mere hours after the conduct or events described, suggests a nontestimonial purpose.

{26}     Our Supreme Court's guidance in *Romero*, on the other hand, counsels that the timing circumstance supports a testimonial purpose for the historical statements. In *Romero*, "the examination occurred several weeks after the assault," which supported a conclusion that "the portions of the victim's narrative specifically accusing [the d]efendant of sexual assault and other charges should have been excluded." 2007-NMSC-013, ¶ 17. In the present case, many years elapsed between the conduct or events alleged in the historical statements and the sexual assault examination. That passage of time suggests, as Defendant argues, that the need for urgent medical treatment related to the historical statements had ended by the time of the examination. The State argues to the contrary and relies on the unchallenged findings of the district court that (1) Chavez is a family nurse practitioner and a psychiatric mental health nurse practitioner who is able to diagnose and treat under her own license"; and (2) "[t]he time frame from the last abusive event . . . would not require [Chavez] to only take history for the acute abusive event because [she] is able to diagnose and treat." Based on these findings, the State argues that "[h]aving a complete picture of [V]ictim's sexual abuse was necessary to aid [Chavez] in assessing the physical and psychiatric harm done to her—i.e., diagnosing such conditions as post-traumatic stress disorder, anxiety, and depression and evaluating her risk for suicide." In reply, Defendant characterizes the State's argument as leading to a situation in which "*all* accusations of prior crimes during a SANE

interview are admissible because they are potentially relevant to psychiatric diagnosis and obtaining an accurate history," and warns that "[t]his theory" would allow the State to "use the dual role of a SANE nurse to end-run the Confrontation Clause."

{27} This dispute reveals the overlapping nature of the timing circumstance, the circumstance of Chavez's professional identity, and the combined inquiry into the statements and actions of both participants in the sexual assault examination. *See Tsosie*, 2022-NMSC-017, ¶ 75. While the nature of Chavez's work and her statements and actions established a medical purpose for the questions that she asked, the function of the timing inquiry is as a surrounding circumstance that provides information about the primary purpose of the statement to be admitted. That so much time had elapsed between the alleged incidents and the sexual assault examination suggests a testimonial purpose for Victim's statements, even though Chavez may have asked each question in her role as a medical professional for a medical reason. Thus, we follow *Tsosie*'s example and decline to blend the objective analyses of these separate circumstances and inquiries. *See id.* ¶¶ 76-77, 83-93 (considering "the circumstance of the time elapsed between the alleged assault and the SANE exam" and "the circumstance of the SANE nurse's identity as it bears on the challenged statements" separately); *see also* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:27 (4th ed. 2025) (noting that "*Crawford* and

*Davis* point toward four somewhat overlapping factors, or areas of inquiry, that are pertinent in deciding whether a statement is testimonial").

**4.       The Location of the Sexual Assault Examination**

{28}      Based on *Tsosie*, the location of the sexual assault examination suggests a nontestimonial purpose for the statements. *See* 2022-NMSC-017, ¶¶ 78-79. The examination in this case took place at the Family Advocacy Center in Albuquerque, New Mexico, which is the same location that our Supreme Court considered in *Tsosie*. The *Tsosie* Court described the Family Advocacy Center as "a setting conducive to providing trauma-informed medical treatment" and noted that the "deliberate conditions of the clinical setting" at the Family Advocacy Center function to serve "medical care purposes." *Id.* ¶ 78. Thus, in alignment with *Tsosie*, we conclude that "the medical care relevance of the clinic location [is] a circumstance weighing toward the primary purpose of the [examination] being nontestimonial." *Id.* ¶ 79.

**5.       Law Enforcement Involvement in the Sexual Assault Examination**

{29}      Also weighing toward a nontestimonial primary purpose is law enforcement's involvement in the sexual assault examination. *See id.* ¶¶ 80-82. As we have explained, to the extent that we have considered law enforcement's involvement in scheduling the sexual assault examination as part of the events leading up to the examination, our analysis corresponds to that in *Romero*. *See* 2007-NMSC-013,

¶ 17. Otherwise, law enforcement's involvement resembles that in *Tsosie* and *Mendez*. The *Tsosie* Court rejected the defendant's arguments that the primary purpose of statements during the sexual assault examination was to create evidence to prosecute the defendant because the victim was transported by law enforcement, agreed to file a police report, and authorized the release of evidence to the police. 2022-NMSC-017, ¶¶ 80-81. In *Mendez*, our Supreme Court explained that "[a]bsent some evidence that the police were attempting to manipulate the examination, we would not place dispositive weight on their presence on the premises or even in the examination room." 2010-NMSC-044, ¶ 37.

{30} Nor do we place dispositive weight on law enforcement's further involvement. Neither the responding officer nor the Detective were present in the room where the sexual assault examination took place, and only Chavez stepped into the lobby where the Detective was questioning Mother at some point during the interaction. And despite Defendant's position to the contrary, the after-the-fact involvement of the crime lab technicians who processed the physical evidence collected during the examination and the fact that Victim never returned for a follow-up appointment do not bear directly on our analysis of the circumstances of the examination itself. Thus, aligned with *Tsosie*, we conclude that this circumstance would lead a reasonable person in Victim's position to understand that her statements had a primarily nontestimonial purpose. *See* 2022-NMSC-017, ¶ 81.

**6.      Chavez's Professional Identity as a SANE as It Bears on the Primary Purpose of Victim's Statements**

**{31}**      The professional identity of a SANE as a questioner and the context of a sexual assault examination are circumstances that are relevant to discerning the primary purpose of challenged statements. *Id.* ¶ 43. As the *Tsosie* Court noted, a SANE has a dual medical and forensic role, because the SANE provides medical care and also collects and preserves evidence. *Id.* ¶ 44. The dual role means that we must analyze "which role [was] more present in eliciting" each contested statement, while bearing in mind that this factor "is likely to change multiple times" during the examination. *See id.* ¶¶ 51-52. Before turning to the individual statements, however, we consider the State's argument that Chavez's broader scope of practice, as both a SANE and a nurse practitioner, "show[s] that the scope of medical care she was providing was broader than that of a typical SANE."

**a.      The Relevance of the SANE's Credentials**

**{32}**      Chavez's broader scope of practice does not factor into whether her questions had a greater medical or forensic purpose. Our Supreme Court in *Tsosie* observed that the district court "attributed undue significance to [the SANE]'s testimony that she *cannot* 'diagnose.'" *Id.* ¶ 108 (emphasis added). Regardless of the limits of the *Tsosie* SANE's scope of practice, the record in that case included "multiple examples of [the SANE] in fact providing medical treatment to [the d]eclarant," and the *Tsosie* Court explained that "questions and answers related to such treatment

were provided to assist in the provision of medical care at least as regards treatment," even if the provider had limited ability to diagnose. *Id.* ¶ 110 (emphasis omitted). In short, *Tsosie* establishes that questions may "enabl[e] the provision of medical care," even if the care itself is not within the questioner's scope of practice. *Id.* ¶ 109. "The issue is whether such questions were important to the SANE nurse's ability to provide medical care." *Id.* ¶ 112. By the same reasoning, Chavez's expanded scope of practice, though undoubtedly helpful in formulating medically relevant questions and explaining their purpose, has little bearing on whether the purpose of the question that was asked during the sexual assault examination was to enable medical care.

{33}     Following *Tsosie*'s example, our task is to analyze whether any forensic purpose associated with Chavez's questions was more important than the question's medical care purpose. *See id.* ¶ 84. Unlike *Tsosie*, the record before us does not include the forms that elicited the contested statements. Our review, therefore, is limited to Chavez's testimony about the questions she asked during the examination.

**b.     Weighing Chavez's Dual Medical and Forensic Roles**

{34}     Chavez's testimony about the questions that she asked and the medical reasons for asking them is relevant to determine whether her role as a SANE was primarily medical or forensic, because such testimony may be an indicator of the underlying purpose that a reasonable medical care provider would have had in

eliciting particular statements during a sexual assault examination. *See id.* (using the same procedure with the benefit of the sexual assault examination forms). Seven of Chavez's questions to Victim were admitted at trial and are therefore part of our record. Chavez asked Victim, "How old were you the first time something happened?" After Victim's response, Chavez asked, "What was the first memory you have of it being different?" and a few moments later, after an additional response from Victim, Chavez asked, "How old?" Chavez also asked whether Victim was worried that she would become pregnant, and, "what was different about today that helped you tell?" Chavez also testified that she asked, "Did it make your body feel different?" and "when I asked you about choking, you said, quote unquote, 'not today'—what did you mean?" At one of the pretrial hearings on Defendant's motion to exclude and suppress, Chavez explained why these questions were necessary from a medical perspective to encourage Victim to disclose information that in turn would enable the provision of particular medical care.

{35} First, each of Chavez's questions encouraged disclosure. Chavez testified that the first question was "important because part of diagnosing child sex abuse is delineating what happened." The other questions were "open-ended" because at that point, she did not "know exactly what has happened." She left it to Victim to tell "in her own words what had happened."

{36}     Second, disclosure of historical allegations allowed Chavez to assess the need for medical care. Chavez explained that the age of a victim at the time that the abuse occurred is relevant to personality formation and worldview and also allowed her to evaluate the potential for current injury and infection. Importantly, Chavez testified that delayed disclosure increases psychological risks, including "worthlessness and guilt" and "anxiety, depression, suicide, poor relationships, [and] hypersexuality." By asking questions that encouraged Victim to disclose, Chavez explained that she was assessing the risk that the abuse would continue as well as suicide and negative psychological effects "down the line." Specifically as it relates to pregnancy, Chavez explained that she had concerns about whether Victim "had been pregnant—if—again, ongoing sexual abuse, her risk of pregnancy is high." Chavez indicated that she asked about whether "it ever ma[d]e [Victim's] body feel different," in order to "know where to look for potential injury—so all of it's relevant, pain is always relevant." Chavez testified that Victim's report of choking indicated a use of physical force and that choking could have long term effects. Ultimately, Chavez asked Victim about "what changed" because as Chavez explained, "I'm an expert in delayed disclosure. So—and here I am—I have a child in front of me seeking medical care, actively disclosing. So I want to know what—what in this child—what empowered this child to finally seek help?" Victim's safety was another concern. Chavez's risk assessment included whether Victim remained at risk in the home

from the person identified as the perpetrator; whether the home is "safe and secure;" and whether other family were "supportive and appropriate." All of this testimony indicates that Chavez's identity during the sexual assault examination was informed as much or more by her medical care role than any evidence-gathering role—or that her questions were medically relevant.

{37} In the district court and on appeal, much of the State's focus has been dedicated to the medical relevance of Chavez's questions, but this approach runs the risk of weighing this single factor too heavily in the surrounding circumstances analysis. As the *Tsosie* dissent pointed out, the inquiry into medical relevance for each question and statement bears remarkable resemblance to the inquiry into the hearsay exception for medical diagnosis and treatment. *Id.* ¶¶ 164-65 (Vigil, J., dissenting); *see* Rule 11-803(4). *But see Tsosie*, 2022-NMSC-017, ¶ 111 (declining to decide whether the standards under Rule 11-803(4) and the Confrontation Clause are identical). The *Tsosie* Court and the dissent agree that the Confrontation Clause and hearsay analyses are distinct. 2022-NMSC-017, ¶ 22; *id.* ¶ 165 (Vigil, J., dissenting). The *Tsosie* Court ensured that the two would not converge by cautioning that the professional identity of the SANE "is merely one of the surrounding circumstances to be weighed" in determining whether the primary purpose of the elicited statement was testimonial or nontestimonial. *Id.* ¶ 52. Thus, Chavez's testimony indicates that her professional identity during the sexual assault

examination was informed as much or more by her medical care role, and we continue the analysis.

**7.      The Analysis of the Surrounding Circumstances**

{38}     We briefly review the surrounding circumstances. The sexual abuse was discovered and reported to law enforcement by Mother. Victim, who was sixteen at the time of the sexual assault examination, had exhibited no prior intention to disclose the sexual abuse. These circumstances suggest that a reasonable person in Victim's position would view the statements as having testimonial primary purpose. The examination occurred at a medical facility, and law enforcement was not present in the room where the sexual assault examination happened. Chavez provided extensive evidence to support a conclusion that she maintained a primarily medical care role when she obtained Victim's history. These circumstances suggest a nontestimonial primary purpose. The historical and immediate statements reported events that occurred both the previous night and repeatedly for more than a decade, which supports a nontestimonial primary purpose for the immediate statements and a testimonial primary purpose for the historical statements. We turn next to the combined inquiry of Victim's and Chavez's interactions.

**B.      Combined Inquiry Into Victim's and Chavez's Statements and Actions, Under the Circumstances**

{39}     We must next analyze the statements and actions of Victim and Chavez "[i]n light of the foregoing analysis of the surrounding circumstances," to determine

whether the primary purpose of each of Victim's statements to Chavez was testimonial or nontestimonial. *See id.* ¶ 97; *see also id.* ¶ 52 (recognizing that "a responding statement may be testimonial notwithstanding the nontestimonial character of the question eliciting that statement where a SANE nurse is acting in their medical care role"). Because Victim did not testify, the evidence of her statements and actions during the examination is limited to Chavez's testimony about her responses as recorded by Chavez in the sexual assault examination report. And because the context is so important, we restate Chavez's questions, this time along with Victim's responses, beginning with the historical statements.

{40}     First, Chavez testified that in response to her question, "How old were you the first time something happened?" Victim stated,

> "I think I was six. Just touching. I remember him moving really fast. We were with his relatives. He moved really fast and stopped. He was touching me."

Next, Chavez testified that Victim responded to her question, "What was the first memory you have of it being different?" by saying,

> "Seven or eight. He wanted to do something to me, harm me. It started hurting. He was trying to injection himself. His penis. It hurt. This one time he tied me up."

Chavez testified that at that point, she asked the clarifying question, "How old?" and Victim responded,

> "I was seven or eight. He tied my legs. He tied my ankles and I was bent down. He raped me, but he did it in my butt. I'm sure it hurt. That

kept going on in the butt. He'd do it once a month. Mom was always at work."

Chavez's testimony indicated that without an intervening question, Victim continued her narrative as follows:

"The next time I remember was fifth grade. He made me believe it was okay. That time he wanted to inject himself in my vagina. He attempted many times, but I'd cry and beg, please. He'd stop, apologize, and say he didn't mean it. It would go like that. In fifth grade, he was successful. He bought me a voice diary to make me happy. Little by little, he'd tell me—I was—he told me he'd stop. He'd cry and say he's going to stop. I believed him. He said it ten times in the trailer we lived in, in the Four Hills area. That kept happening."

Chavez testified that she next asked whether Victim "was worried that she would become pregnant," to which Victim replied,

"Yes. Before, he would pull out. He started pulling out when I was thirteen. He used condoms before that. He hid the condoms in the car. He was really sneaky. He said, 'You'll be fine.' He got bored with that, then started letting the sperm enter my body. I was twelve to thirteen, and I had my period. He would buy the morning-after pill, and I was willing to. I begged him to buy it. . . . Later down the line, between the ages from ten to twelve, he was going, he said he was going to have intercourse with someone else, so I wouldn't have to do it anymore. It was weird. He'd take me to the park. He would meet with women. I was at the park. I grew up at fifteen. One day it just hit. I realized. I got depressed."

As we explain, in light of the surrounding circumstances, we conclude that Victim's and Chavez's statements and actions do not indicate that in providing these historical statements, a reasonable person in Victim's position would have been focused "on

something other than proving past events potentially relevant to later criminal prosecution." *See Tsosie*, 2022-NMSC-017, ¶ 69.

{41} While Chavez had a medical purpose in asking the questions to assess Victim's psychological state and assess her future risks, no evidence suggests that a reasonable sixteen year old in these circumstances would view the responses about what had happened years before as statements that were intended to enable medical care. *See id.* ¶ 52 (declining to conflate the "SANE['s] . . . questions with a declarant's responses" (emphasis omitted)). Many statements communicate that these events occurred long ago. Other statements make direct accusations of criminal activity. Still other statements appear to help Victim with remembering what happened and when—references to who was there, where they lived, where something took place. But nothing about these statements indicate that a reasonable person in Victim's situation would be seeking to enable medical care with these statements, particularly in light of the events prior to the examination, Victim's age, and the timing of the disclosure. Importantly, our record contains no information about how the sexual assault examination was described to Victim or for what specific services (beyond the physical examination) Victim gave her consent. The evidence does not indicate that Chavez's medical purpose in asking the questions—for example, suicide risk assessment or medical diagnosis of child sexual abuse—

was communicated to Victim or that Victim's responses relating to historical events were for the purpose of enabling or guiding the provision of medical care.

{42} We now turn to Victim's and Chavez's statements and actions regarding the immediate statements. As noted above, Chavez did not testify about what question elicited the portion of Victim's narrative containing the immediate statements, but the context indicates that at this point, the narrative had shifted to the events of the previous day. Chavez repeated Victim's statements to the jury as follows:

> "My brother saw him touching me. He said, 'it was weird.' I was watching Princess and the Frog. He was"—and in parentheses, I have, stepdad—"was touching me. My brother ran to my mom. I thought he was getting a charger. He started to do more, oral to me. My brother stayed in the other room. I heard them coming fast. It was my mom." Exclamation points. "She went to see—saw something, she knew something was wrong."
>
> . . . .
>
> "I was scared. I thought I'd die the day she found out. I just stood there. It was okay. I wasn't scared. She asked me. She threw him out. Then I told her."

With the immediate statement in mind, we return to *Tsosie* for guidance about how to analyze this statement in light of Victim's and Chavez's actions. *Id.* ¶ 99.

{43} In *Tsosie*, the Court concluded that "[t]he majority of [the d]eclarant's responses to [the SANE's] questions provided information that was important to guide the provision of medical care in relation to the medical care purposes of the particular questions." *Id.* The Court noted that while some responses may exceed the

nontestimonial scope because they "identify or accuse a defendant of specific criminal acts," others were "rendered nontestimonial by virtue of a primary purpose that focuses the participants on something other than proving past events potentially relevant to later criminal prosecution." *See id.* (internal quotation marks and citation omitted). Thus, *Tsosie* indicates that statements that identify the defendant or make an accusation of a specific act are testimonial unless the questions guide the answers toward the provision of medical care and focus on something other than generating evidence of a crime.

{44}     The immediate statements, considered under the circumstances, are largely not related to the provision of medical care and instead provided contextual narrative for specific accusations of crimes. Chavez relayed Victim's specific accusations of "touching" and "oral" to the jury but did so by repeating Victim's charged narrative, which is in contrast to Chavez's other (unchallenged) testimony that relayed Victim's bare report that the previous day she had experienced vaginal and anal penetration as well as cunnilingus. A reasonable person in Victim's circumstances would expect that information about physical contact would direct the provision of medical care. But the narrative that Chavez relayed to the jury went further, and the record before us does not show that either the questions or the circumstances of the interview would have focused a reasonable person in Victim's situation on

something other than generating evidence of a crime. *See id.* For that reason, the immediate statements, with two exceptions, served a primarily testimonial purpose.

{45} In two respects, Victim relayed information that a reasonable person in her circumstances might expect to be primarily for a medical purpose. In addition to the testimony quoted above, Chavez also testified that she asked Victim, "Did it make your body feel different?" and Victim responded, "Pain in my area, my vagina, it hurt a lot, all the time. But not really today." Chavez testified that the purpose of this question was to assess pain, and Victim's response indicates that she understood and provided a past and current pain assessment. Chavez also testified as follows:

> "When I asked you about choking, you said, quote unquote, 'not today.' What did you mean?" She responded, 'One time. He was assaulting me in my room. I screamed my brother's name. He kept running. He was little. I said, you can go. He put his arm around me to shut me up. He put his arm around my neck to shut me up. It was his arm or his hand to shut me up.' I asked, "So choking—no choking today?" and she said, 'No.'"

This narrative has both historical and immediate aspects. The historical statements fall subject to the same analysis as the other historical statements, and therefore have a primarily testimonial purpose. The immediate statement, however, in response to "No choking today?" suggests a nontestimonial primary purpose because a reasonable person would expect that the statement would direct the provision of medical care. These two statements therefore weigh more heavily toward a nontestimonial purpose under the circumstances. *See id.* ¶ 69.

## II.  Harmless Error and Sufficiency of the Evidence

{46}  Because the statements with a testimonial purpose violated the Confrontation Clause, and because the State has offered no argument as to harmless error, this case must be remanded for a new trial provided that the evidence was sufficient to permit retrial. *See State v. Johnson*, 2004-NMSC-029, ¶¶ 9, 11, 136 N.M. 348, 98 P.3d 998 (attributing the burden to prove harmless error to the state and outlining the harmless error analysis for the purposes of the Confrontation Clause); *State v. Consaul*, 2014-NMSC-030, ¶¶ 41-42, 332 P.3d 850 (reviewing the evidence in the light most favorable to the verdict to determine whether the evidence presented at the first trial "was sufficient to warrant a second trial").[4] Viewing the evidence in the light most favorable to the jury's verdict, we have satisfied ourselves that the evidence set forth throughout this opinion, together with other evidence about Victim's age at different times, was sufficient to warrant a second trial. *See State v. Lente*, 2019-NMSC-020, ¶¶ 61-70, 453 P.3d 416 (requiring a child witness in a resident child molester case

---

[4]Our review for sufficiency of the evidence is limited to the evidence that was admitted at the original trial to ensure that retrial does not violate double jeopardy protections. We cannot predict what evidence would be admitted at a new trial, and we therefore cannot consider the sufficiency of that evidence. We nevertheless note that the evidence considered by the Court in *State v. Lente*, 2019-NMSC-020, 453 P.3d 416 to be sufficient was not hearsay evidence and that the child witness was cross-examined. *See State v. Sarracino*, 1998-NMSC-022, ¶ 15, 125 N.M. 511, 964 P.2d 72 ("The most important interest is the defendant's right to a fair trial, which requires that the state produce sufficient evidence to prove every element essential for conviction beyond a reasonable doubt.").

to describe the unlawful act in sufficient detail to establish that the act occurred and permit the jury to distinguish between charged acts, a number of unlawful acts that support each count, and "the general time period in which the proscribed acts occurred").

**CONCLUSION**

{47}    We reverse and remand for a new trial.

{48}    **IT IS SO ORDERED.**

_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

_____
**J. MILES HANISEE, Judge**

_____
**MEGAN P. DUFFY, Judge**